On February 6, 1995, decedent was on a business trip to meet a potential client in Kansas City, Missouri. That evening while in Kansas City, decedent suffered a sudden heart attack and died at approximately 11:45 p.m. outside Harrah's Casino.
James E. Smith was originally hired by Barclays American Mortgage in August 1993 as a Production/Team Manager. As Production Team Manager, his duties included hiring approximately eight to twelve individuals for his team. There were approximately eight other teams with approximately 170 people within the department. Each Production Manager supervised his or her team.
In the spring of 1994, the business began to suffer losses and rumors began to circulate regarding the future of the company and the possibility of layoffs. In late spring or early summer of 1994 there was a general layoff in which approximately one-fourth of the department was eliminated. Mr. Royo testified that he and decedent, being part of the management group, were asked to draft a list of all employees within their group "in order of performance, which would be utilized by senior management in their decisions as to which employees would be let go." As a Production Team Manager, decedent assisted members of his team in cleaning out their desks and escorting them out of the building. Mr. Royo also testified that more people were let go than he had anticipated.
Following the general layoff, the number of teams was reduced and the department formed a new group in charge of national marketing. The objective of this group was to develop affinity relationships with various organizations across the country and obtain mortgage business from the members of these organizations. This position, unlike decedent's previous position, required him to travel periodically.
After the National Marketing Group was initiated there were three separate general layoffs occurring approximately every three to four months. These layoffs affected the National Marketing Group, as well as the rest of the department. After the second layoff the department was approximately half the size it had been before the layoffs began. While the members of the National Marketing Group decreased, the goal of contacting as many organizations and obtaining their business did not change. The amount of travel increased as the number of members of the group decreased.
Following the second general layoff there were approximately four members of the National Marketing Group. Several months passed and there was a third layoff. Following this layoff, the National Marketing Group had two members, decedent and Jose Royo. Mr. Royo testified at the hearing that he was laid off by Barclays in January of 1995. This left decedent as the last remaining member of the National Marketing Group. Mr. Royo testified that he had conversations with decedent about being the only one left in the group and it was "all on him to try to get this thing done at that time." According to the business travel records for decedent, since starting the national marketing position he never traveled more than four days in a row and had only worked both a Saturday and a Sunday in July of 1994 when several individuals in the department went to Atlanta for a convention. In addition, prior to the February 6, 1995 trip decedent had never had two trips back to back without at least three days in between.
During the last nine days of his life, decedent had worked without a day off. He had flown to Phoenix on Thursday for business and was in Phoenix until Sunday, arriving back in Charlotte at approximately 8:00 p.m. Sunday evening. On Monday morning, decedent left his home at approximately 6:00 a.m. to go to the office to complete paperwork from his Phoenix trip, retrieve his laptop computer and obtain his itinerary for his trip that afternoon to Kansas City, Missouri. Decedent arrived in Kansas City at approximately 4:49 p.m., rented a car and checked into his hotel. Decedent was traveling alone on February 6, 1995; therefore there is no specific evidence as to decedent's activities that evening.
An "accident" in the Workers' Compensation context is "an unlooked for and untoward event which is not expected nor designed by the person who suffered the injury . . . The elements of an `accident' are the interruption of the routine of work and in the introduction thereby of unusual conditions likely to result in unexpected consequences." Poe v.Acme Builders, 69 N.C. App. 147, 149, 316 S.E.2d 338, 340 (1984) (quotingAdams v. Burlington Industries. Inc., 61 N.C. App. 258, 300 S.E.2d 455
(1983)).
In the present case, the decedent had been working for nine days straight without a day off. He had flown to Phoenix on Thursday for business and was in Phoenix until Sunday, arriving in Charlotte approximately 8:00 p.m. Sunday evening. Plaintiff testified that decedent left their home at approximately 6:00 a.m. Monday morning to go to the office to complete paperwork from the Phoenix trip, get his laptop computer, and to obtain his itinerary for his trip that afternoon to Kansas City, Missouri. Mike Ellis, the decedent's supervisor, testified that it was not typical for his employees to work nine days straight. When asked about decedent's travel schedule during those nine days, Mr. Ellis stated that it "was not a normal situation." In addition, plaintiff testified that it was unusual for her husband to be away on a business trip for an entire weekend. The travel log indicates that at no time had decedent traveled that many days in a row during a month since he began at this position.
In addition to establishing an "accident," it must take place within the course of the employment. Decedent's death took place while he was out of town on a required business trip. With respect to employment that requires travel away from the employer's place of business, the North Carolina courts have held that the employee is within the scope of his employment continuously during his travels except when there is a "distinct departure for a personal errand." Cauble v. Soft-Play. Inc.,124 N.C. App. 526, 528, 477 S.E.2d 678, 679 (N.C.App. 1996), (citingMartin v. Georgia-Pacific Corp., 167 S.E.2d 790, 793 (1969)). This has been defined by the North Carolina courts to mean that traveling to and from a hotel or traveling to and from a meal and even the duration of time spent lodging in a hotel are acts performed in order to further the business of the employer.
This is also true of employees that are "returning to their hotel or going to a restaurant . . . after having made a detour for his own personal pleasure." Id. at 329 (quoting Chandler v. Teer,53 N.C. App. at 770, 281 S.E.2d at 721 (citing Martin v. Georgia-PacificCorp., 167 S.E.2d 790, 793 (1969))).
The evidence supports the conclusion that decedent was acting within the scope of his employment at the time of his death. When circumstances exist, as in the present case, the North Carolina courts have held that when an employee is "found dead under circumstances indicating that death took place within the time and space limits of the employment, in the absence of any evidence of what caused the death," the claimant may rely on a presumption that the death resulted proximately from a work related injury. Pickrell v. Motor Convoy. Inc., 322 N.C. 363, 367, 368 S.E.2d 582,584 (1988).
Based on the presumption, the burden then shifts to the defendants to establish evidence of a non-compensable cause. In the present case, defendants argue that decedent's heart attack was not related to job stress, however, plaintiff has produced convincing evidence of the unusual conditions and his unusual exertion of working nine days straight with his death occurring on the ninth day. Bason v. Kraft Food Service.Inc., 535 S.E.2d 606, 608 (2000).
Dr. Bonita J. Peterson performed the autopsy of decedent and noted her findings in the report. In reviewing the autopsy report it is important to note things that are present and also note those things not present. Dr. Peterson did not detect any signs of previous heart attack or damage to the heart muscle. Dr. Peterson was aware of many risk factors with regard to heart attacks and that job stress can be a risk factor as well as a triggering mechanism for a heart attack. Dr. Peterson affirmed the statement that an individual may possess many risk factors, but the triggering mechanism is the actual cause of the heart attack.
Based on Dr. Peterson's testimony, it was established that job stress could have been the precipitating factor in the decedent's heart attack and death. Because the physician who performs the autopsy is usually otherwise unfamiliar with the deceased, it is then necessary to look to other information regarding the deceased's life in order to determine the cause of death. Based on the evidence in this case, it is important to review the testimony of the decedent's wife as well as his co-worker.
Dr. Gerald Galst, a board certified physician who specializes in cardiovascular disease, testified for the plaintiff regarding his experience with heart attack patients over his thirty-five years of practice. Dr. Galst reviewed the medical records initially and then was provided details regarding decedent's work schedule and work environment in order to make an assessment.
Dr. Galst defined "risk factors" as parameters, which identify individuals as being prone to develop coronary artery disease. Dr. Galst stated that both acute and chronic stress have physiologic effects which precipitate ischemia, which means that when an organ such as the heart does not get an adequate blood flow, angina and heart attacks often result. Dr. Galst distinguished a trigger from a risk factor by explaining that a trigger is not a medical term but, with respect to decedent, it refers to some event or series of events which causes what was a latent disease to become clinically manifest. In decedent's case, it became manifest by his sudden death. Stress can be a triggering mechanism because stress increases the levels of adrenaline-like fluids in an individual's circulation, which in turn lowers the threshold for ventricular irritability, irregularity and ventricular fibrillation, which is what occurred in decedent. There is ample documentation in the medical community that stress is an important factor in producing, exacerbating, aggravating or precipitating myocardial ischemia.
Practicing physicians, including cardiologists, in addition to numerous studies and articles, acknowledge a strong association between psychological factors, stress, and myocardial ischemia and fatal ventricular arrhythmias. Dr. Galst explained the findings of a study published in 1981 in the Journal of the American Medical Association
entitled Acute Psychological Disturbances Preceding Life ThreateningVentricular Arrhythmias (Vol. 246, p. 233). The study concluded that of the participants in the study who survived cardiac arrests associated with ventricular arrhythmias, the vast majority of these patients had experienced major stressful events 24 to 48 hours prior to arresting. Dr. Galst stated that this study was particularly relevant because decedent was noted to have a fatal ventricular arrhythmia.
Within a reasonable degree of medical certainty, increased stress would act as the trigger of a heart attack in an individual such as decedent, who was in a stressful situation where he was working long hours and experiencing pressure in terms of deadlines and job insecurity. Dr. Galst also stated that this environment would ordinarily be expected to cause stress, and if an individual, such as decedent had risk factors, the stressful work environment would be the "straw that broke the camel's back." Based on the testimony of the plaintiff, as well as decedent's coworker, Jose Royo, it is clear that the work environment at Barclays was a stressful one. Therefore, the medical evidence presented supports the conclusion that the stressful work environment, especially the unprecedented 9 continuous days of work and the stress of being away from home, was the triggering event that caused decedent's death.
Under these circumstances, in my view, decedent suffered a compensable injury by accident while in the course and scope of employment.
This 22nd day of March 2002.
 S/_____________ THOMAS J. BOLCH COMMISSIONER